# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| GEM Hospitality, LLC, *et al.*[1] | ) Case No. 18-80361 |
| | ) (Joint Administration Requested) |
| Debtors. | ) |
| | ) Honorable Thomas L. Perkins |

### DECLARATION OF JEFFREY T. VARSALONE IN SUPPORT OF
### CHAPTER 11 PETITIONS & FIRST DAY MOTIONS

I, JEFFREY T. VARSALONE, declare under penalty of perjury, that:

1. I am a Managing Director in the Corporate Recovery Services Group at CBIZ, Inc. On March 14, 2018, CBIZ was retained to provide crisis management services to the above-captioned Debtors (defined below), and I am the proposed Chief Restructuring Officer of the Debtors for the bankruptcy cases.

2. Since March 14, 2018, I have participated in preparations for the filing of chapter 11 cases for GEM Hospitality, LLC, and all of the above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***"). I am above 18 years of age, and I am competent to testify.

3. The Debtors have operated under a receivership order since February 9, 2018, and the receiver has maintained operational and books and records control since that date. For that reason, my current knowledge of the Debtors' operations, budgeting, and cash management is based on limited available information. Nevertheless, I have reviewed and analyzed historical financial information and overseen the preparation of a proposed budget for use of cash collateral, have reviewed documentation provided by the Debtors related to their operations and debt

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: GEM Hospitality, LLC (6259); Pere Marquette Hotel, LLC (2079); Pere Marquette Courtyard, LLC (3235); Pere Marquette Garage MT, LLC (2707); and Pere Marquette Garage, LLC, (6817).

structure, and consulted with the Debtors' corporate managers and administrative staff in preparation for these chapter 11 cases. I anticipate expanding such knowledge as operational control is returned to the Debtors during these chapter 11 cases.

4. On March 17, 2018 (the "*Petition Date*"), the Debtors filed voluntary petitions (the "*Petitions*") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "*Bankruptcy Code*"), in an effort to preserve and maximize the value of their chapter 11 estates for the benefit of all creditors and stakeholders.

5. The Debtors intend to operate their businesses and to manage their properties as debtors-in-possession under §§ 1107(a) and 1108 of the Bankruptcy Code.

6. The Debtors have requested certain relief in "first day" applications and motions filed with the Court (collectively, the "*First Day Motions*") to minimize potential adverse effects of the bankruptcy filings and to maximize the value of their estates. I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of the chapter 11 cases (the "*Cases*") and in support of the Debtors' voluntary petitions and First Day Motions.

7. Except as otherwise indicated in this Declaration, all facts set forth here are based upon my personal knowledge, my communications with the Debtors' managers and administrative staff, my knowledge and review of relevant documents including the Debtors' historical financials, and my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition and my prior experience in similar cases. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

2

8. I am familiar with the contents of each First Day Motion (including the exhibits) and the facts set forth therein are true and correct to the best of my knowledge. The relief sought in each First Day Motion will provide an orderly transition of the Debtors into these Chapter 11 Cases and ultimately permit the Debtors to maximize recoveries for all parties in interest. Further, I believe the relief sought in the First Day Motions is in each case narrowly tailored and necessary to achieve the goals identified above, and, accordingly, best serves the interests of the Debtors' estates and stakeholders.

## I. Overview of the Debtors' Businesses

9. Debtor GEM Hospitality, LLC ("*GEM*") is the majority member and manager of the other Debtors entities—Pere Marquette Hotel, LLC ("*Hotel*"), Pere Marquette Courtyard, LLC ("*Courtyard*"), Pere Marquette Garage MT, LLC ("*Garage MT*"), and Pere Marquette Garage, LLC ("*Garage*"), which collectively own and operate two hotels and a related parking garage in downtown Peoria, Illinois

10. Debtor Hotel owns the real property and improvements (collectively, the "*Property*") on which the two hotels and parking garage are located.

11. Specifically, the Property houses the 286-room Marriott Peoria Pere Marquette and the 116-room Courtyard Peoria Downtown, as well as an attached 402 space parking deck, and an elevated walkway that connects the complex to the Peoria Civic Center. Hotel leases a portion of the Property to Courtyard, which operates the Marriott Courtyard Peoria, and a portion to non-debtor Pere Marquette Historic, LLC ("*Historic*"), which operates the Peoria Marriott Pere Marquette. Hotel also leases a portion of the Property to Garage MT, which subleases it to Garage, the parking garage operator.

12. The Peoria Pere Marquette dates from 1927, and reopened as a full service Marriott

3

after an extensive renovation on June 28, 2013. The Courtyard Peoria Downtown, which is newly constructed, opened on June 28, 2014. Both hotels operate with Marriott International, Inc. brand affiliations.

13. The hotels operate under the Marriott flag pursuant to franchise agreements dated July 18, 2014, with Marriott International, Inc. (as amended, the "*Franchise Agreements*"). While the two hotels operate with different service profiles, they share some physical space such as the indoor swimming pool, the loading dock and the parking deck. The laundry facility, the engineering department, the security department, and the management offices are located in the Marriott Peoria Pere Marquette. Guests of either hotel can utilize the amenities at both hotels. For example: Marriott Rewards members staying at the Courtyard Peoria Downtown can use the Concierge Lounge at the Marriott Peoria Pere Marquette. As a result, the hotels collectively can offer a wide range of services to many different market segments.

14. Courtyard and non-debtor Historic operate the hotel properties utilizing services contracted through hotel management agreements dated June 15, 2014, with First Hospitality Group, LLC ("*FHG*"). Under the respective management agreements (the "*Management Agreements*"), FHG provides full-service operational management of both Courtyard and Historic, with authority (subject to certain specified limitations) to direct, supervise, manage and operate the hotels in accordance with the procedures, practices, management techniques and other rules of operation as proscribed by Marriott. As part of its duties as agent for Courtyard (and Historic), FHG contracts with vendors, maintains appropriate insurance, pays taxes related to hotel operations, and manages the books and records of both hotels.

15. FHG is solely responsible for the hiring and supervision of hotel employees, and may contract with third party staffing companies for such services. To the extent such persons are

4

employees or contractors, they are employees or contractors of FHG. Courtyard and Historic have no employees of their own. However, although the employees are employed or contracted by FHG, Courtyard and non-debtor Historic are obligated to satisfy all employee-related expense and obligations by ensuring that such funds are available out of operating cash or, if necessary, advancing sufficient funds to cover employee costs.

16. FHG is paid a management fee for its services, and is indemnified by Courtyard and non-debtor Historic against certain liabilities that may arise.

## II. Debt Structure

17. As of the Petition Date, the Debtors are obligated on secured debt to three lenders with security interests against all of the Debtors' real and personal property, in the approximate aggregate amount of $44 million. The senior secured lender is INDURE Build-to-Core Fund, LLC (f/k/a IBEW-NECA Diversified Underwritten Real Estate Fund, LLC), the City of Peoria is a subordinated lender and mortgagee, and Main Street Land Trust is also a subordinated lender and mortgagee. Debtors Hotel, Marriott, Garage MT and Garage are all mortgagors and borrowers under the INDURE, City and Peoria, and Main Street Land Trust loan documents. GEM is a guarantor of the indebtedness under the INDURE loan documents, as are Gary Matthews and Monte Brannan.

18. In addition, the Debtors have general unsecured debt of approximately $2,500,000-$3,000,000 as of the Petition Date.

## II. Events Leading to the Debtors' Bankruptcy Filing

19. On February 27, 2017, INDURE filed a foreclosure complaint and related motion to appoint a receiver against the Debtors and certain other entities with interests or alleged interests in the Property, currently pending as case no. 17 CH 100 in the Circuit Court of the Tenth Judicial Circuit, Peoria County (the "*Foreclosure Suit*").

20. While the Foreclosure Suit was pending, the Debtors tried unsuccessfully to refinance its senior and subordinated debt even though the Debtors, in good faith, believe that the value of the Property is more than adequate to support a restructured loan portfolio. In August 2017, an internationally recognized commercial real estate concern appraised the Property in a range from $48,000,000 "as is" to $58,100,000 in stabilized condition.

21. On February 9, 2018, the state court entered an order of foreclosure and sale in favor of INDURE and appointed Bob Howard of Remax Commercial as receiver (the "*Receiver*"), and ordered a sheriff's sale of the Property. The sheriff's sale was scheduled to occur on March 19, 2018, and has been stayed and continued to 1:00 PM on April 18, 2018 as a result of this filing.

22. The chapter 11 cases were commenced to preserve the value of the Property for the benefit of all of the estates' creditors. As a rule, the foreclosure process is not designed to maximize the value of an asset, and during the short time frame from the appointment of the Receiver to the proposed sheriff's sale (approximately 9 weeks), it does not appear that actions have been taken to maximize value for the benefit for any party other than senior lender, INDURE. In fact, the foreclosure sale, if allowed to go through, will primarily—if not solely—benefit INDURE, who will likely obtain ownership of the Property for far less than fair value.

23. The Debtors continue to pursue potential financing and remain in discussions with lenders that evaluated the Property for refinancing in 2017. The Debtors have commenced these Cases to fully implement their restructuring efforts.

### III. First Day Motions

24. Below is a brief discussion of the Debtors' First Day Motions and an explanation of why, in my belief, such motions are critical to the success of the Cases. More detailed descriptions of the facts pertaining to the Debtors' operations and the bases for the requested relief in each motion can be found in the relevant First Day Motions.

25. As described more fully below, the relief requested in the First Day Motions was carefully tailored by the Debtors, in consultation with their professionals, to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm. At all times the Debtors' management and professionals remained cognizant of the limitations imposed on debtors-in-possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these Cases to those issues that require urgent relief to sustain the Debtors' operations.

### A. Application for Emergency Hearing on First Day Motions

26. The Debtors have applied to have the First Day Motions heard on an emergency basis, and I believe that such relief is necessary and appropriate on an immediate basis. If certain of such relief is not granted immediately, the Debtors risk substantial disruption to their ongoing operations, which could result in immediate and irreparable harm to the Debtors and their estates and creditors. The need for this emergency hearing was not caused by any lack of due diligence or any act or failure to act by the Debtors' or their counsel, but by the circumstances of these Cases.

### B. Motion for Authority to File a Consolidated List of the 20 Largest Unsecured Creditors & Consolidated List of All Creditors

27. The Debtors seek (a) authority to file a consolidated list of the 20 largest general unsecured creditors in lieu of submitting separate creditor lists for each Debtor, (b) authority to use a consolidated list of all their creditors in lieu of a submitting separate lists of all creditors for each Debtor.

28. Because a large number of creditors are shared amongst the Debtors, the Debtors request authority to file a single, consolidated list of their 20 largest general unsecured creditors (the "*Top 20 List*"). I believe using a Top 20 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

29. Further, for the same reason that a large number of the Debtors' creditors are shared amongst them, the Debtors are requesting the Court's approval of a consolidated list of all their creditors (the "**Consolidated Creditors List**"). I believe using a Consolidated Creditors List will similarly reduce the administrative burden and costs of administering these Cases, and reduce the likelihood of duplicating service on creditors in the Cases.

### C. Motion for Entry of Interim and Final Orders Authorizing the Use of Cash Collateral and Providing Adequate Protection to the Secured Creditors

30. To continue their operations without interruption, the Debtors need immediate authority to use cash collateral to maintain hotel operations.

31. Absent authority to use cash collateral, the Debtors risk immediate and irreparable harm to their operations and their reputations. The Debtors do not have sufficient working capital to maintain operations in the ordinary course without the ability to access cash collateral.

32. Although the Debtors believe that INDURE (who has a citation lien on the Debtors' cash and bank accounts) is oversecured, the Debtors nonetheless intend to pay adequate protection in the form of interest in the amounts approved in the cash collateral budget.

33. I believe that use of cash collateral and the provision of adequate protection is necessary and in the best interests of the Debtors and the bankruptcy estates.

### IV. Conclusion

34. In conclusion, for the reasons stated here and in each of the First Day Motions, filed concurrently or in connection with the commencement of these Cases, I request that each First Day Motion be granted in its entirety, together with any other, further relief the Court deems appropriate under the circumstances.

[Signature Page Follows]

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Dated: March 19, 2018

_____
Jeffrey T. Varsalone
Proposed Chief Restructuring Officer for:

GEM Hospitality, LLC
Pere Marquette Hotel, LLC
Pere Marquette Courtyard, LLC
Pere Marquette Garage MT, LLC
Pere Marquette Garage, LLC