FILED
ROBERT M. SPEARS
8/22/2019 4:34 PM
CLERK OF THE CIRCUIT COURT
PEORIA COUNTY, ILLINOIS

## IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT OF ILLINOIS
## PEORIA COUNTY

|  |  |  |
|---|---|---|
| GARY E. MATTHEWS, individually and as a representative of EM PROPERTIES, LTD., and MONTE J. BRANNAN<br>Plaintiffs,<br><br>v.<br><br>THE CITY OF PEORIA, et al., JAMES ARDIS, individually and as Mayor of the City of Peoria,<br>Defendants, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 19 L 49<br><br>**JURY DEMANDED** |

### AMENDED COMPLAINT

NOW COME the Plaintiffs, GARY E. MATTHEWS, individually and as a REPRESENTATIVE OF EM PROPERTIES, LTD., and MONTE J. BRANNAN, by and through their attorney, CHRISTOPHER P. RYAN, P.C., and as and for their Amended Complaint against Defendants, THE CITY OF PEORIA, et al. (hereinafter "the City"), and JAMES ARDIS, individually and as Mayor of the City of Peoria (hereinafter "Mayor Ardis"), state as follows:

1.      This claim involves negotiations and contracts entered into with the City of Peoria, involving the Pere Marquette "Project", consisting of the Pere Marquette Hotel, the Courtyard Hotel, a sky walkway, and the deck attached to the Hotels, all of which are located in the City of Peoria, Peoria County.

2.      The Defendant, City of Peoria, is a municipal entity and James Ardis is a resident of Peoria County and Mayor of the City of Peoria.

3.      The vast majority of the events referred to in this Complaint occurred in Peoria County.

4.      EM Properties, Ltd. is an Illinois S corporation solely owned and operated by
Gary Matthews. GEM Hospitality, LLC is an Illinois limited liability company in part owned by
EM Properties, Ltd., and at the time and circumstances described in this complaint, EM
Properties, Ltd.  was a managing member of GEM Hospitality, LLC.

## HISTORY OF THE PERE MARQUETTE PROJECT

5.      Initial feasibility plans regarding the Pere emphasized the importance of
increasing hotel rooms and increasing the booking in said Hotel or Hotels by creating a walkway
which would connect the Hotel complex to the Peoria Civic Center.

6.      To develop this goal of revitalizing the Hotel Pere Marquette and the remainder of
that block on Main Street, including the building of a skywalk connected to the Civic Center,
Plaintiffs sought investors for the Project, and invested over $1 million in the Project prior to any
formal financing for the Project being obtained.

7.      From 2007 to 2010, Matthews and Brannan (developers) entered into negotiations
with Defendants (City of Peoria) concerning a proposal to redevelop the Pere Marquette Hotel
and adjacent properties on Main Street.

8.      Brannan invested in the Project but also participated in development through his
company, Brannan & Company, LLC. He reached an agreement with Matthews and EM
Properties that he would share in the developer's fee payable as part of the Project.

9.      Throughout 2007 to mid-2010, the parties had worked cooperatively with various
agreements signed indicating an intent of all parties to develop a newly revitalized hotel.

10.      The goal of the parties was to develop a newly revitalized hotel that would spur
business development along the Main Street corridor and result in a hotel that would have a
connection by walkway to the Peoria Civic Center.

11.    As a result of those negotiations, a new Redevelopment Agreement was reached on June 2, 2010 (see attached Exhibit A). That Agreement was signed on or about April 14, 2010 by Gary Matthews as President of EM Properties, Ltd. The Redevelopment Agreement stated among other things:

> "Whereas, in order to enhance the quality of life in the City, to provide an economic stimulus to the area of the City within which the Project Site is located in order to attract other private development which will enhance the tax base of the City and to further the objectives of the Redevelopment Plan, the City pursuant to its Home Rule Powers under Article 7 of the Constitution of the State of Illinois, the powers granted to the City pursuant to each of the TIF Act and the Business District Act, as supplemented by the power and authority of the City as a Home Rule Muncipality, intends to assist the Redeveloper to help alleviate certain costs of the Redeveloper in the redevelopment and construction of the Project; and"

> "Whereas, the City believes it is necessary to redevelop the Project Site in order to arrest the economic and physical decline of the Redevelopment Project Area, and to promote a policy of stabilization not only in the Redevelopment Area and the Business District, but also in the surrounding area of the City; and"

> "Whereas, to support the Redeveloper in the construction and operation of the Project, the City is willing to provide the Redeveloper the incentives set forth in this Agreement; and"

> "Whereas, without the assistance of the City as set forth in this Agreement, the Redeveloper would not redevelop the Project Site; and"

> "Whereas, the parties hereto have entered into that certain Redevelopment Agreement between the City of Peoria and EM Properties, Ltd. dated as of December 19, 2008 (the "Original Agreement")."

12.    The agreement further required under Article 4, "City Obligations", the City to utilize its Enterprise Zone tax exemptions in Paragraph 4.7. It required the City to vacate the eastern half of the alley or street and convey those to the developer, use reasonable and good faith efforts to take all action necessary to cooperate with Redeveloper and working with the Historic Preservation Commission or any other governmental agency in the event the Hotel is designated a "landmark", and employ reasonable good faith efforts and take any and all action

3

necessary to assist Redeveloper in obtaining Federal Historic Preservation Tax Credits and structure the agreements between the parties to maximize the receipt of such credits in Paragraph 4.12.

13.    The Redevelopment Agreement further required that the redeveloper (EM Properties, Ltd./Gary Matthews) indemnify the City for the performance of the Contract (see Paragraph 6.4 and 6.5).

14.    By September 14, 2010, the development had proceeded sufficiently far that a Construction Agreement was executed between the same parties.

15.    During the initial phases of rehabilitation of the Pere Marquette Hotel, Plaintiffs were seeking permanent financing for the Project, which was estimated to cost a total of as much as $90 million at the time. Throughout late 2010 and early 2011, a formula was being put together which would involve a group of banks, including local and out of state lenders who would form a core investment group, and an additional funding source was developed at great time and expense involving Historic Tax Credits (which included a legislative change to be enabled) and additional private investment. The agreed upon rate for the primary lending group was to be 7.25%.

### City's First Breach of Contract

16.    On or about August 31, 2011, the City terminated the Redevelopment Agreement (see attached Exhibit B). However, as Plaintiffs' attorneys stated in their response to the City's unilateral cancellation of the Redevelopment Agreement, the City's basis was pretextual (see attached Exhibit C). Plaintiffs' attorneys went on to point out that the City's refusal to accept certain documents was not in good faith, and in any event, there was always a sixty (60) day right to cure contained in the Redevelopment, which the City was ignoring. In closing, Plaintiffs'

counsel reserved the right to initiate litigation pursuant to the Redevelopment Agreement for breach if the matter could not be resolved.

17.     During negotiations that followed, the City's true purpose in pretextually cancelling the Redevelopment Agreement was revealed. Specifically, in negotiating with the team of John Elias as legal counsel, Mayor Ardis, and Patrick Urich, numerous comments were made that rather than issuing bonds, that the City should have an ownership interest in the Hotel. On several occasions, Mayor Ardis openly opined that the City should ultimately own the Hotel.

18.     Mayor Ardis, Urich and Elias all stated on numerous occasions that the City should be getting 7.25% on a mortgage rather than an approximate 1% return on employee's pension funds that the City had invested as part of its holdings.

19.     These three further explained on numerous occasions that the City's employee's pension investments were restricted to very conservative forms which only brought a low percentage, but that real estate was a permissible form of investment which would bring higher returns. At all times, the City insisted on being treated the same as the commercial lenders if it invested its employee's pension funds.

20.     This desire of the City to increase and create an ownership interest of the City and the Hotel and to increase a return on its invested employee's pension funds resulted in the Amended and Restated Redevelopment Agreement (see Exhibit D).

### AMENDMENT OF THE REDEVELOPMENT AGREEMENT AND GENESIS OF THE CITY'S MORTGAGE INTEREST

#### The Amended and Restated Redevelopment Agreement

21.     The City's cancellation of the Contract threatened the existence of the project and at that time several millions of dollars invested by the Plaintiffs and others in the Hotel Project.

The City used its leverage gained by its wrongful termination of the Project to extract numerous concessions as part of the Amended and Restated Redevelopment Agreement.

22.      Specifically, during negotiations, the City insisted on reducing its bond holdings by $7 million and proposed that they would contribute $7 million to the project as a second mortgage (see Paragraph 6.1). This significantly increased the debt burden of the Hotel and provided no benefit to the Project.

23.      During negotiations, the negotiating team of Mayor Ardis, Urich and Elias reiterated that employee's pension funds could be invested in real estate as long as they were secured by a mortgage. The rates on the mortgage owned by the primary lending group were 7.25%.

24.      The Amended and Restated Redevelopment Agreement was contingent on the other parties to the Pere transaction agreeing to let the City's mortgage become the second-place stakeholder behind the prime lending group and jump ahead of other mortgage holders and investors.

25.      The Agreement further subordinated the developer fee owned by Matthews and Brannan. Whereas normally a developer's fee is paid in a lump sum upfront, in this case the developer's fees would only be paid in increments out of cashflow if the Hotel met certain financial targets, which effectively placed the developer's fee behind all of the secured creditors (see Paragraph 7.1).

26.      Plaintiffs were forced to accept the City's insertion of itself in second position behind the primary lenders (which occurred over strenuous objections from Main Street Land Trust and other parties who would now be behind the City in the order of repayment) because at all times, the City's negotiating team threatened that if the City was not allowed to reduce its

bond obligation from $36 million to $29 million with a $7 million mortgage, the City would not agree to restarting the Project.

27.     Paragraph 6.6 required the City to enter into a Subordination and Intercreditor Agreement with the Senior Lender subordinating the City's payments and barring the City to take any enforcement action with regard to the project loan without the consent of the Senior Lender.

28.     On November 10, 2011, the parties signed an Amended and Restated Redevelopment Agreement. Matthews signed as President of EM Properties, Ltd., as managing member for GEM Hospitality, LLC, which owned the majority of Pere Marquette Hotel, LLC, and as President of Pere Marquette TIF, Inc.

29.     The Agreement terminated by its own terms on the later of the termination of the Redevelopment Plan, or October 27, 2031.

**SECOND AMENDMENT TO REDEVELOPMENT AGREEMENT**

30.     After the City's termination of the Redevelopment Agreement in August of 2011 and the formation of the Amended and Restated Redevelopment Agreement of November 10, 2011, the parties continued to engage in negotiations to implement some of the issues surrounding the Amended and Restated Redevelopment Agreement, and to finalize the lending required to continue the rehabilitation of the Pere Marquette Hotel and to begin demolition and other work on the Main Street properties which was necessary for the Courtyard.

31.     Through 2011 and into 2012, the Project encountered difficulties with demolition and reconstruction of the Hotel and legal disputes with contractors and other interested parties, which threatened the completion of the Hotels within the originally projected completion dates. Several extensions of deadlines were agreed to by the parties but throughout the process, the City

began demanding more information, more input on decision-making concerning the Hotel, and

became more demanding for information, including information that was not beginning supplied

to any of the other stakeholders or mortgage holders in the Project. Once again, the City

threatened to terminate the Project if various concessions were not made by Plaintiffs to provide

the City with its unparalleled request for information and control of decision-making from a

second mortgage holder.

32.     This led to a Second Amended Redevelopment Agreement entered into

approximately February 28, 2012 (see attached hereto as Exhibit E).

33.     The primary changes to the Redevelopment Agreement were to modify the terms

of how the loans were to be administered, bonds to be issued, and determining who was paid

what and in what order as money began to flow into the Project and the construction proceeded.

34.     Additional paragraphs were devoted to ensuring that the City did not attempt to

cancel the Agreement during the period was subject to Hotel credits, which were overseen by

Chevron, because a default on the Historic Tax Credits would be catastrophic to the Project and

would result in a failure of the entire Project (see Paragraph 6.7).

35.     In addition, the City also requested different certifications and organizational

charts from Plaintiffs concerning operations of the Hotel (Paragraph 8.5), and twenty-nine

specific document requests which involved the interwoven agreements between all of the

investors in the Hotel (Paragraph 8.6). These requests gave the City what it claimed to be a right

of approval over issues, including the master disbursement agreement between the senior lender

and other creditors, approval over the Intercreditor Subordination Agreements between all

parties, and gave the City the right to veto virtually every document that was being implemented

as part of the intricate and complex construction of the Courtyard and the reformation of the Pere

Marquette Hotel, as well as the skywalk and rebuilt parking facility. These twenty-nine

"requests" gave the City unprecedented control, which at least on paper equaled or exceeded that

of INDURE, Caterpillar, South Side Bank, and Morton Community Bank. These requests were

far beyond what other mortgage holders had requested and what other lien holders, such as Main

Street Land Trust and other claimants against proceeds of the Hotel, had requested.

36.     Again, the Plaintiffs were forced to accept the proposals of the City based on the

continuous and omnipresent threat of the City to negate the Redevelopment Agreement if its

demands were not met.

37.     In mid-March 2012, demolition work and construction began on the Pere

Marquette Hotel resulting in its temporary closure.

## SUBORDINATION AND INTERCREDITOR AGREEMENT

38.     The Subordination and Intercreditor Agreement (hereinafter "Intercreditor

Agreement") dated April 12, 2012 required that all creditors, including the City, were

subordinated to the Senior Lender including any and all terms and conditions of the mortgages,

and that such subordination would apply

> "notwithstanding (i) the availability of other collateral in addition to the Senior
> Mortgage and (ii) the actual date and time of the execution, delivery,
> recordation, filing or perfection of any of the Subordinate Loan Documents or
> (iii) the Senior Loan Documents, or the lien or priority of payment thereof."
> (Paragraph 2a)

39.     In Paragraph 2b, the Intercreditor Agreement stated:

> "in addition, without limiting the foregoing, each Subordinate Lender agrees
> that *all rights of such Subordinate Lender to payment of its corresponding
> Subordinate Loan and in and to any and each Borrower's interest in all or any
> part of the Project and all or any part of the other Collateral (including
> assignments of leases and agreements for the use, occupancy, maintenance, or
> operation of any portion of the Project and the rights with respect to insurance
> proceeds and condemnation awards)* under its corresponding Subordinate
> Mortgage or under any other Subordinate Loan Document shall, subject to the

9

terms of this Agreement, be expressly subject and subordinate to (1) the rights of the Senior Lender in and to all and each portion of the Project and all and each portion of the other Collateral (including assignments of leases and agreements for the use, occupancy, maintenance, or operation of any portion of the Project and the rights with respect to insurance proceeds and condemnation awards) arising under the terms set forth in either Senior Mortgage and/or any other Senior Loan Document; and (2) indefeasible payment of the Senior Debt."

40.     Under Paragraph 2i, the document further restricted the ability of Subordinate Lenders such as the City from taking any action to (1) accelerate its loans; or (2) exercise any of its remedies under the Subordinate Loan Agreement or to enforce the rights under its Subordinate Loan Documents even in the event of default; and (3) restricted the Subordinate Lenders from commencing any legal proceedings against the Borrower; or (4) consent to any modification, amendment, supplement, consolidation, increase, replacement, restatement, renewal, substitution, or other alteration of the Subordinate Loan Documents; or (5) commence, collude in or consent to any bankruptcy, insolvency, reorganization or similar proceeding by or against Borrower (see Exhibit F).

### New Corporate Entities Created for the Hotel

41.     In the spring of 2012, at the same time the Intercreditor Agreement was being negotiated and signed, a variety of other entities were created. The basis for these hotel-based corporations' creation were arcane legal issues concerning the issuance of Historic Tax Credits which formed a substantial part of the Hotel funding. Some of the corporations created at this time include Pere Marquette TIF, Inc. (Illinois S Corporation, Gary Matthews sole owner, dissolved March 18, 2019), Pere Marquette Hotel, LLC (at the time of the occurrence GEM Hospitality, LLC was the manager, GEM Hospitality, LLC over 80% owner, active), Pere Marquette Historic, LLC (Illinois Limited Liability Company, member managed, owner was primarily Chevron USA, Inc., dissolved July 12, 2019), Pere Marquette Courtyard, LLC

(manager – GEM Hospitality, LLC, owned 99% by GEM Hospitality, LLC, dissolved July 12,

2019), Pere Marquette Garage, LLC (manager – GEM Hospitality, LLC, owner – GEM

Hospitality, LLC, dissolved July 12, 2019), and Pere Marquette Garage MT, LLC (manager –

GEM Hospitality, LLC, owner – GEM Hospitality, LLC, dissolved July 12, 2019).

42.    As a preface to the opening of the Hotel Pere Marquette and subsequently the

Courtyard, Management Agreements were created between GEM Hospitality, LLC and

Courtyard Management Corporation (a Marriot corporation) for management of the Hotel. The

Management Agreement in part stated at Paragraph 11.02 (page 38) under the heading <u>Consents</u>

<u>and Cooperation</u>:

> "Wherever in this Agreement the consent or approval of Owner or Manager
> is required, such consent or approval unless otherwise noted shall not be
> unreasonably withheld, delayed or conditioned, shall be in writing and shall
> be executed by a duly authorized officer or agent of the party granting such
> consent or approval. If either Owner or Manager fails to respond within thirty
> (30) days to a request by the other party for a consent or approval, such
> consent or approval shall be deemed to have been given, except (i) as
> otherwise expressly provided in this Agreement, or (ii) in the case of consents
> or approvals that may be granted or withheld in the sole discretion of the
> party, in which case a failure to respond shall be deemed to be a withholding
> of consent or approval. Additionally, Owner agrees to cooperate with
> Manager by executing such leases, subleases, licenses, concessions,
> equipment leases, service contracts and other agreements negotiated in good
> faith by Manager and pertaining to the Hotel that, in Manager's reasonable
> judgment, should be made in the name of the Owner. Each Owner shall be
> bound by the approvals and consents granted by any prior Owner."

43.    That Agreement, dated August 17, 2011 and attached as Exhibit G, was assigned

to the City in an Assignment of Management Agreement dated approximately April 12, 2012,

attached as Exhibit H. In that document, in Paragraph 7, Pere Marquette Hotel, LLC and Pere

Marquette Courtyard, LLC agreed as follows:

> "Each Assignor agrees not to do, or suffer or permit to be done by any third
> party, any of the following acts without the prior written consent of the
> Assignee first being had and obtained, to-wit: (a) cancel, terminate or

surrender any Hotel Agreement, other Project Document(s), or Development Rights; (b) forgive any material obligation thereunder; (c) materially modify any of the foregoing; (d) assign either Assignor's interest in any of the foregoing or any portion thereof; or (e) fail to perform any obligation in accordance with the provisions thereof, which failure would constitute a default under any of the Hotel Agreement, the other Project Documents, or the Development Rights and which failure shall continue beyond any applicable cure period provided thereunder. Any of said acts, if done or suffered to be done without the Assignee's prior written consent, shall constitute an Event of Default."

## OPENING OF THE PERE MARQUETTE AND COURTYARD HOTELS

44.     On June 28, 2013, the Pere Marquette opened.

45.     In June of 2014, the Courtyard Hotel opened.

46.     Also, in June of 2014, the Management Agreement between Marriott and the Hotel Pere Marquette entities, including the Plaintiffs, was expiring.

### Hotel Management Agreements

47.     Plaintiffs advised that Marriott, by its own rating service, rated its own management as "failing". Plaintiffs were receiving "yellow cards" from Marriott threatening termination of the Marriott franchise, despite the fact that at this point Plaintiffs were not conducting any asset management of the Hotel and were not involved in the day-to-day operation of the Hotel. In fact, at that time Marriott was not escrowing property taxes as required by various agreements and was not paying the franchise fees to Marriott Corporate, or other bills.

48.     The Plaintiffs pointed out to the City that Marriott's horrific asset management and day-to-day management of the Hotel was so bad that it was hurting the Hotel's performance and that Marriott was threatening to terminate its own franchise being overseen by its own agents and employees. Their rating was so low that if a third-party got this rating at a Marriott Hotel, their contract was terminable instantly.

49.    Pursuant to the Management Agreement and the Assignment of Management Agreement attached as Exhibit G, the City was not in a position to unreasonably deny consent to a management change particularly where there were objective facts showing that mismanagement by the Marriott team was harming the Hotel's income.

50.    Nonetheless, despite these facts, the City demanded additional unrelated concessions to the "Marriott problem" in order to garner its consent.

51.    Despite the fact that it was in the City's best interest to remove Marriott as the management entity of the Hotel, the City demanded that a "Side Letter" be created which allowed further intrusion of the City into the day-to-day management of the Hotel, including requiring proprietary information concerning loans between the creditors, payment structures as to how income was being distributed between the various mortgage holders and other entities, and otherwise inject itself into the Hotel as a second mortgage holder far beyond that of any other party in the project (see attached hereto as Exhibit I).

52.    The "Side Letter" was so intrusive that it raised concerns among the attorneys of several parties as to whether or not the City's demands were so excessive that they were actually violating the complicated payment schedule that had been worked out in the Intercreditor Agreement and "waterfall" provisions that determined how hotel income was distributed as between the various mortgage holders.

53.    The City claimed it had an absolute right to determine who would manage the Hotel in its sole discretion because of the Management Agreement. However, based on the evidence above, the City was presented with evidence that Marriott had to be removed, that Marriott had consented to be removed and that FHG was a well-known management team that could take over.

13

54.    The City unreasonably used its rights under the Management Agreement to dictate the terms of the "Side Letter" Agreement, all the while threatening to simply refuse to the management change in an effort to extort further control over the Project from Plaintiffs and into the hands of the City.

55.    At all times during negotiation on the "Side Letter" Agreement, the City maintained a constant threat to interfere with the Project if the "Side Letter" Agreement that it had tendered to Mr. Matthews. No other mortgage holder in the Project had these rights and no other Lender in the Project objected to switching Marriott out and inserting FHG.

56.    The City's position breached the terms of the Management Agreement and Assignment of Management Agreement, and breached the terms of the Intercreditor Agreement because the City was using management issues that it held under its various agreements with the Matthews' entities as a lever and threat to derail the Project if its demands were not met.

57.    The Agreement was signed on or about July 1, 2014 by Gary Matthews for EM Properties, Ltd. for GEM Hospitality, LLC for Pere Marquette Hotel, LLC, Gary Matthews for Pere Marquette TIF, Inc., Gary Matthews for EM Properties, Ltd. for GEM Hospitality, LLC for Pere Marquette Courtyard, LLC, Gary Matthews for EM Properties, Ltd. for GEM Hospitality, LLC for Pere Marquette Garage MT, LLC, Gary Matthews for EM Properties, Ltd. for GEM Hospitality, LLC for Pere Marquette Garage, LLC, and finally, Gary Matthews as personal guarantor.

## 2016 EFFORTS TO OBTAIN REFINANCING

### Marriott and Problems with Marriott

58.    Throughout the end of 2015 and 2016 attempts were made to find a refinancing entity for the Hotel. Contracts were signed with Vista Capital to seek quotes for a refinancing

14

agreement on the Pere Marquette and Courtyard Hotels. In June and July of 2016, Vista Capital

obtained seven different quotes for a refinancing agreement with the Hotels. Of these, the quote

by Deutsche Bank of $48.5 million including various attractive terms was the best.

### The Deutsche Bank Negotiations

59.    On July 28, 2016, Deutsche Bank submitted a term sheet offering $48.5 million

for refinancing of the Hotels.

60.    Based on the Deutsche Bank offer, good faith deposits of $125,000, $200,000,

and $25,000 were paid for the continuing refinancing project by Plaintiffs.

61.    The Deutsche Bank document required that it be the only stakeholder remaining

after payment other than Matthews and Brannan as the developers and GEM Hospitality, LLC

who constitute investors in the Hotels.

62.    The Deutsche Bank proposal contained numerous advantages for the Hotel

project, including but not limited to:

      a)  An interest rate lower than the then current mortgage interest rate; and

      b)  The opportunity to switch from the Marriott brand to hotel brands such as

          Hilton or Sheraton. Such a switch from Marriott would decrease the burden of

          the Hotel for food service because Marriott required approximately 4% of

          gross revenue of the food service to be paid to Marriott as a fee. This resulted

          in ± an $180,000 a year expense to Hotel. Hilton and other hoteliers do not

          have such a requirement and would allow the Pere Marquette to lease its space

          out to a restaurant tour to provide the service and charge rent, thereby creating

          cash flow instead of a significant expense.

    c) In addition, the loan was assumable and transferable, which would foster the

goal of an ultimate refinancing of the Hotel to pay off the prime lending

group, City of Peoria, Main Street Land Trust, and others, and would actually

increase the value of the Hotel because an assumable loan is attractive to

many investors.

63. These advantages would have made the Hotel significantly more viable as it
proceeded and would be advantageous to all parties.

64. The Agreement also was a non-recourse loan, meaning that Matthews and
Brannan would not be personally obligated on the primary mortgage.

65. It was also clear in the Agreement that Matthews and Brannan would not receive
funds at closing, although they would remain as part of the group that would be equity owners of
the Hotel.

66. At the time the Deutsche Bank offer was discussed between the parties, there was
an insufficient sum to pay off all of the principal, all of the regular interest, all of the prepayment
penalties which were written into the initial loans, and all of the punitive interest that had
accrued based on late or failed payments.

67. As a result, negotiations began concerning the Pere Marquette Hotel/Courtyard
including the INDURE Pension Fund, Caterpillar, Morton Community Bank, Southside Bank
(now Busey Bank), Main Street Land Trust, Core Construction, the Marriott Corporation, the
Plaintiffs, and the City of Peoria. During the course of these negotiations, the banking
institutions led by INDURE all agreed to waive "yield maintenance", which is a form of
prepayment penalty included in most commercial loans, and punitive interest in the approximate
amount of $5 million. Main Street Land Trust also agreed to waive penalties and some interest,

and Core Construction agreed to a reduction of the amount owed to them relating to construction of the Hotel. In addition, there were proposals to Marriott which would have restructured the debt to Marriott and reduce expenses owing to Marriott.

68.     However, the City represented by Mayor Ardis and City Manager Patrick Urich, and represented by John Elias of Elias, Meginnes & Seghetti, P.C. as legal counsel, all stated at numerous times, in the presence of witnesses, and by texts or other communications that the City would not waive one penny of the maximum possible recovery that it could obtain.

69.     In a meeting with Caterpillar, Mayor Ardis stated that going to the City Council for any reduction in the maximum amount the City could recover on its loan would be "political suicide", despite the fact that the Hotel was performing poorly and there was discussion of possible foreclosure on the Hotel if a refinancing entity could not be found, thus risking the entire City mortgage. He, Patrick Urich and John Elias repeated similar statements in other meetings.

70.     In fact, all of the other investors in negotiation on the Hotel debt were reducing their maximum claims because of a recognized risk that if the Hotel was forced into bankruptcy, they could lose all or a portion of their investments.

71.     The City was the sole non-negotiating party, presumptively because it did not want to lose the 7.25% interest it had bragged about by virtue of its second mortgage and did not want to lose the control over the Project it had exerted through its repeated demands to modify the Redevelopment Agreement and other documents.

72.     In fact, at a meeting at the Courtyard Hotel with Deutsche Bank and other creditors either present personally or by phone, when everyone else was stating how much their party would be willing to decrease their claim by in order to make the proposal work, Mayor

17

Ardis angerly stated "we will not take a haircut" and "we have more invested than anybody else here".

73.     Aside from being an incorrect assertion by Mayor Ardis as to the relevant interests of the parties in the negotiation, the City's position abjectly failed to recognize the risk of foreclosure that was looming over the parties based on worsening financial conditions generally, and specifically at the Hotel Project.

### Failure to Close Deutsche Bank

74.     In late October of 2016, the closing date on the Deutsche Bank was not consummated due in large part to the City's refusal to discuss any negotiated diminution of their maximum potential claim.

75.     During the following weeks, repeated efforts were made to get all parties to agree to a reconsideration of a deal with Deutsche Bank.

76.     On November 2016, Marriott terminated the reservation systems of the Hotel Pere Marquette.

77.     In late November and December of 2016, during meetings between all stakeholders, it was clear that because of the completed negotiations with the Peoria Diocese on its ground lease and increased rent amounts that would accrue, the offer on the loan for the Hotel would likely decrease slightly from the previous offer.

78.     As a result of these conditions, all four lenders in the INDURE led group (the INDURE Pension Fund, Morton Community Bank, Caterpillar, and South Side Bank/Busey Bank) agreed to a further reduction of their claims by $250,000 each for a total of $1 million. The other creditors, including Main Street Land Trust, Core Construction and others made

further pledges to reduce the amount paid to them in a last-ditch effort to get the Deutsche Bank claim approved.

79.     However, once again, the City refused to consider any reduction of its claim from the maximum possible allowed. The only concession from Mayor Ardis, during these meetings, was that he would take the proposal for a reduction of the interest payable to the City Council (with full payment of principal due and owing being promised) but would not "sponsor" it and made it clear he would not support or promote it with the City Council.

80.     On information and belief, such a proposal was never placed before the City Council, nor was the City Council ever advised of the status of the Deutsche Bank negotiations or requests for City reduction in its loan, or the risk of threat to foreclosure on the Hotel, which could ultimately risk not only its approximate $7 million second mortgage, but also risk performance of payment by the Hotel on the City's roughly $29 million in bonds.

## TERMINATION OF DEUTSCHE BANK PROPOSAL
## AND COMPLAINT FOR MORTGAGE FORECLOSURE

81.     On January 3, 2017, Deutsche Bank sent formal notice that it was terminating any offers on the Hotel.

82.     Had either proposition with Deutsche Bank been brought to consummation, the following would have occurred:

a)   The prime lending group consisting of the INDURE's Pension Fund/INDURE, Southside Bank, Morton Community Bank and Caterpillar would have been paid their principal and interest;

b)   The City of Peoria would have been paid their remaining balance on the principal mortgage of approximately $6.3 million and possibly some accrued interest;

19

c)  Main Street Land Trust would have been paid the reduced amount they agreed
to take on their mortgage during negotiations and release their claim against
the Hotel;

d)  Core Construction would have taken the reduced amount that they agreed to
take in satisfaction of their Mechanic's Lien and would have released said
Lien against the Hotel;

e)  The taxes on the Pere Marquette Hotel and Marriott would have been paid a
substantial portion of what it was owed with an agreement as to how to pay
down the remaining amounts owed to Marriott through future hotel revenues;

f)  The interest of Matthews and Brannan and their development fee valued at
approximately $9.3 million would have been preserved; and

g)  The interest of the investors consisting of Pere Marquette LLC would have
been preserved. Based on appraisals at the time the Deutsche Bank offer was
offered, the investors consisting of Pere Marquette LLC's interest would have
been valued at approximately $29.2 million. Matthews and Brannan's interest
in Pere Marquette LLC as members would have been valued at approximately
$1.4 million each.

### Foreclosure

83.     On or about February 28, 2017, INDURE filed its Complaint for Mortgage
Foreclosure and Other Relief.

84.     On March 3, INDURE filed a Motion to appoint a receiver and remove Plaintiffs
from asset management of the Hotel.

85.     Rather than work cooperatively together with Plaintiffs, the City chose to attack

Plaintiffs in violation of the provisions of the Redevelopment Agreement and other agreements

between the parties and even joined the motion for foreclosure and for the appointment of a

receiver.

86.     The City attorneys spent voluminous hours and money fighting over the course of

2017 with attorneys for INDURE over "yield maintenance" provisions contained in their

mortgages (see INDURE'S Reply in Support of Motion for Summary Judgment, dated January

1, 2018; 17-CH-100).

87.     While these battles ultimately led to INDURE and the prime lending group

agreeing to waive "yield maintenance", this was the exact same negotiating position INDURE

and the prime lending group had been in at the time the Deutsche Bank offers had been

considered.

88.     During 2017, despite requests for the City to assist in negotiations with Marriott

on its unpaid franchise fees, the City failed to offer any such assistance with the reservation

system and debt negotiations, in a manner wholly contrary to the intentions and cooperative

spirit set forth in the Redevelopment Agreement documents to ensure success of the Project.

89.     Nonetheless, Plaintiffs continued, for some time, negotiating with Marriott to

continue the reservation system in an attempt to keep the Hotel in operating condition and obtain

a lender who could avoid the foreclosure initiated by INDURE and joined in by the City of

Peoria.

## LATE 2017 EFFORTS TO REFINANCE WITH YAM CAPITAL, LLC

90.     Despite the efforts by INDURE and the City to force the Hotel into bankruptcy through a foreclosure action, Plaintiffs continued in attempts to obtain another bid for hotel refinancing.

91.     In July, Matthews signed an engagement letter with CBRE for the purposes of obtaining interested lenders for the Pere Marquette Hotel.

92.     On October 25, 2017, they received a Letter of Intent from YAM Capital, LLC, a private lender, to fund the sum of $38 million.

93.     On November 30, 2017, YAM sent a term sheet with proposed payouts to the interested creditors.

94.     YAM's proposals differed from that of Deutsche Bank in that:

  a)     it was a two-year term with the option for two additional years;

  b)     it reduced the mortgage from 7.25% to 4.25% which obviously would assist with Hotel operation expenses;

  c)     it would introduce a new hotel manager that would be at a lower rate than that charged by FHG, again assisting the Hotel's expenses;

  d)     it proposed to pay the interest of the INDURE group and preferred prime lenders;

  e)     The City of Peoria would be paid a $2 million lump sum payment with the remainder of its mortgage interest to be converted to preferred equity, a form of interest which many experts would describe as a better and more secured interest than that of a second mortgage; and

f)     Additionally, the Plaintiffs offered and proposed a permanent 1%

surcharge under the Hotel District Taxing Authority which would be

charged to clients of the Hotel Project making the total amount paid to the

City 4%. This 1% surcharge would exist *permanently* and would not

expire no matter what happened to the Hotel mortgage or who was the

owner. This provision was approved by YAM and offered (by the City's

own admission) a conservatively estimated an additional $200,000 per

year in additional revenues, which could be used to further pay down

bonds involved in the Project

95.     Again, the Plaintiffs worked diligently to obtain consents from all parties to

effectuate the YAM restructured deal, which would have avoided a threaten foreclosure action

by INDURE and probable bankruptcy.

### January 9, 2018 City Council Meeting and Cancellation of YAM Proposal

96.     On January 9, 2018, a City Council meeting was held to approval the refinancing

agreement under the terms suggested by YAM.

97.     As the City of Peoria was the last necessary party to agree to the proposal, the

City attorneys, Mayor Ardis and the City Council knew, or in the exercise of any semblance of

reasonable care should have known, that all parties to the transaction were watching the City

Council meeting with interest.

98.     Nonetheless, the public portion of the meeting concerning the proposal

immediately began with Councilmember Akeson stating that rather than take the deal, they

should force the Hotel into foreclosure and deprive Plaintiffs of their interest in the Hotel.

99.    Other councilmembers displayed complete ignorance of the YAM proposal by claiming that the City of Peoria's interest would be "unsecured" and expressed opinions that were oblivious to the fact that a bankruptcy of the Hotel would probably destroy the City's mortgage interest in the Hotel, despite the fact that within approximately 48 hours of the meeting they were advised by Attorney Elias that there would a Judgment of Foreclosure entered by INDURE against the Hotel.

100.    Councilwoman Moore stated that is was "the ugliest deal I have ever seen". Further, Councilman Montelongo stated "I just don't trust the current developer, we have had a bad track record with him, and we are signing up for another round of it. I just don't see a good outcome to this. I would rather just cut our losses now and move forward. It is going to get better as soon as we can turn it around with whoever the next owner ends up being." Other councilmembers voiced their dislike of the deal in the first place while newer members pointed out that they were not there for the initial votes in 2008 which started the Project but were attempting to make the best of a "bad" situation.

101.    The City Councilmembers were obviously aware that people were listening because they made numerous references to the "listening audience". Nonetheless, the atmosphere of the publicly aired portion of the City Council meeting was one of negativity towards the developers, negativity towards the Project, negativity towards the prime lending group and particularly the local lenders.

102.    Shortly after the City Council meeting, Matthews received a call from the CFO of YAM stating that his underwriters had watched a livestream of the City Council meeting and upon researching the issue further had determined that they would not recommend investing in a

24

project in the City of Peoria based on the violent antipathy of the City Council to the developer and the project in general, and the overall negative attitude of the City towards moving forward.

103. Despite the call from YAM's CFO, additional efforts were made by Plaintiffs to convince YAM to invest in the project, based on the fact that the City Council did approve the YAM proposal by a large majority. However, no one from the City attempted to contact YAM to correct any misperceptions left by the publicly aired portion of the City Council meeting, or to offer any assistance in trying to persuade YAM to change its mind.

104. On February 10, 2018, YAM cancelled its term sheet and the offer.

105. On February 12, 2018, the Circuit Court of Peoria entered an Order appointing a receiver.

106. On March 17, 2018, the Hotel filed for bankruptcy protection in the U.S. Bankruptcy Court for Central District of Illinois, pursuant to Chapter 11.

## CITY CONDUCT PRIOR TO HOTEL AUCTION

107. During the Hotel's Chapter 11 proceedings, both in pleadings in that case and in statements to the public, Mayor Ardis and the City of Peoria continued to attack the Plaintiffs.

108. Specifically, the City:

    a)    in pleadings declared that Plaintiffs had inappropriately taken money from the Hotel, alternately describing that conduct as dishonest, fraudulent, and incompetent; and

    b)    reinforced those perceptions in press conferences throughout the bankruptcy proceedings.

109.   The City apparently launched these vitriolic and slanderous attacks on Plaintiffs out of a belief that the "Side Letter" executed in mid-2014 required Plaintiffs to effectively perform asset management of the Hotel without any form of reimbursement whatsoever.

110.   In these attacks, Mayor Ardis and the City failed to notify the public or the courts that:

a)   hotels of this size mandate asset management, which performs functions that the day-to-day managers of hotels do not such as: review weekly money management reports; review monthly disbursement statements; perform income management, including making sure that various debts are paid in a timely fashion; perform tax compliance notifications for loans, such as increment financing and historic credits that were involved in this Hotel Project; provide data to accountants to perform tax calculations;

b)   the fees for asset management of a hotel of this routinely run in the range 3-5% of the hotel gross revenue;

c)   not included in normal hotel asset management fees are work such as that involved in the efforts to obtain the Deutsche Bank refinancing, the YAM refinancing effort and other refinancing efforts which were not brought to the point of an offer being formally made; and

d)   Monte Brannan had never signed the "Side Letter", nor did the City ever seek his signature on such an agreement.

111.   None of these complaints were aired by INDURE, Caterpillar, South Side Bank, or Morton Community Bank, or other parties to this litigation, because:

a)   they were aware of the cost of asset management in a hotel of this nature;

26

b)    the payments the City was complaining of had been made with the knowledge of FHG, the hotel manager, and reported to INDURE and Chevron in various financial disclosures periodically made between the parties; and

c)    that the prime lending group and other parties understood the amount of effort and work that was put in by the Hotel asset managers in attempting to coordinate and resolve the various interests of the parties in any attempt to get the Deutsche Bank closing to fruition, a continuing search for other bidders to restructure the debt on the Hotel, as well as to attempt to bring the YAM proposal to fruition, all of which were additions to the normal workload of asset managers.

### EFFECT OF AUCTION PROCESS ON STAKEHOLDER INTEREST

112.    Unsurprisingly, based on the vitriolic atmosphere created by the City in its attacks on Matthews and Brannan, and despite a bidding process and auction process set up by the Bankruptcy Court designed to maximize the recovery on the Hotel, no bidder to the process was found, other than INDURE representing the prime investors group which included Caterpillar, Morton Community Bank and South Side Bank (now Busey Bank).

113.    Upon INDURE being the approved bidder by the Bankruptcy Court, the following occurred:

a)    The second mortgage of the City of a principal balance of $6.3 million with additional interest and penalties raising the amount to over $8 million which included on information and belief well over $1 million in attorney's fees claimed by Elias, Meginnes, & Seghetti was negated;

b) The third mortgage held by Main Street Land Trust for property purchased for building of the Courtyard was negated;

c) Core Construction did not receive any funds for amounts still owed to them, estimated at approximately $2.5 million plus interest, for construction of the Hotels;

d) Matthews and Brannan lost their interest in the developer's fees valued at approximately $9.3 million, as well as their interest in the Pere Marquette LLC valued at $1.4 million each;

e) The investors, Pere Marquette LLC, who had invested well over $1 million in the Project, but whose equity interest, according to appraisal value, should have been worth well over $29 million was lost; and

f) In addition, Plaintiffs herein were required to individually file bankruptcy on April 11, 2018 due to the fact that they had guaranteed various financial instruments involved with the Hotel, which could not be paid out of individual assets.

### COUNT I – BREACH OF CONTRACT AGAINST THE CITY OF PEORIA

1-113. Plaintiffs reallege and reassert paragraph 1-100 as and for paragraphs 1-100 of Count I as though fully set forth herein.

114.    As set forth above, all of the versions of the Original and the Amended and Restated Redevelopment Agreements signed between the City of Peoria and Plaintiffs contain clauses which precluded the parties from unilaterally terminating the Redevelopment Agreement.

115.    In unilaterally terminating the Original Redevelopment Agreement, the City of Peoria breached its agreement with the Plaintiffs.

116.    The City did so with an admitted aim in gaining an ownership footage in the Hotel, rather than merely be a bondholder. This was not an appropriate purpose or basis to terminate a contract and was done in bad faith. This City used the cancellation of the Original Redevelopment Agreement to force the Plaintiffs to:

       a)    agree to terms that they would not have otherwise agreed to and that were disadvantageous for them or more burdensome on them;

       b)    cooperate with the City in persuading all of the other mortgage holders to let the City cut in front of them in line for payment; and

       c)    persuade all of the other investors that the City should move into second place ahead of all of them for a mortgage which did nothing to change the City's overall investment into the Project.

117.    Subsequently, the City used threats to terminate the Contract to gain further concessions in the Second Amendment to the Amended and Restated Redevelopment Agreement. At the time of these threats, the investment of shareholders, such as Plaintiffs and others, in the Hotel Project had grown, and their threats were deemed credible because of their willingness to unilaterally terminate the Original Redevelopment Agreement, despite the investment of millions of dollars from local investors.

118.    The City violated the terms of the Amended and Restated Redevelopment Agreement and Second Amendment to the Amended and Restated to Redevelopment Agreement, as well as the terms of the Intercreditor Agreement and the terms of the Management Agreement, when it unreasonably and willfully demanded further concessions in a "Side Letter". Specifically, it was a breach of the Management Agreements to unreasonably withhold consent, or essentially to condition its consent on unreasonable additional demands.

119.    It was a breach of both the Management Agreements and the Intercreditor Agreement to use management based decisions to threaten literally or figuratively a cancellation of the Contract, or denigration in the operation of the Hotel, despite the fact that if it failed to agree to a management change the Hotels financial performance would suffer and potentially trigger further breaches of contract.

120.    Furthermore, the City's refusal to engage in good faith negotiations in the Deutsche Bank refinancing, when the potential for an insolvency or bankruptcy existed, constituted a breach of the duty of cooperation in the Amended and Restated Redevelopment Agreement as further amended by the Second Amendment.

121.    Subsequently, the City's actions in publicly denigrating and attacking the Developers, including the effective slandering of the Developers in legal pleadings which were further reported by the press and which resulted in the failure of the YAM refinancing, constituted a breach of its duties under the terms of the Redevelopment Agreement.

122.    It is clear from the notes of the public City Council minutes that City Council Members had been advised by counsel or others that somehow they could use their attacks on Mr. Matthews to obtain control of the Hotel for the City, or oust the Developers and substitute the City as management for the Hotel, and usurp the rights of the other investors in the Project, all for the benefit of the City Council.

123.    When the YAM proposal fell through, the City continued, by its Mayor and City Council Members and through their counsel, conducting further public attacks against the Developers accusing them of fraud, criminal conduct, personal malpractice, and malfeasance. This conduct, continuing until the time of the auction of the Hotel, was a violation of the entire premise of the Redevelopment Agreement and its Amendments, a breach of the Intercreditor

Agreement in that it was unilaterally forcing the Hotel into bankruptcy by denying it the capital

and reduction in its expenses that would have occupied either of the refinancing efforts with

Deutsche Bank and YAM, as well as denying the Plaintiffs of the ability to sell the Property at

the bankruptcy court auction process for a fair and reasonable price, rather than the well below

the appraisal value and well below the investment that had been made in the Hotel.

124.    As a direct and proximate result of the City's breaches of the Agreement, the Pere

Marquette Hotel was forced into bankruptcy, as were each of the Plaintiffs. As a result of breach

of the Agreement, each of the Plaintiffs was caused to lose their developer's fees in the Hotel

valued at approximately $9.3 and lost 5% each in GEM Hospitality, LLC, estimated value $1.4

million each.

WHERFORE, based on the foregoing, Plaintiffs pray:

a)   that they jointly be awarded the sum of $9.3 million for the value of the lost
     development fees in the Hotel;

b)   that they jointly be awarded $1.4 million each for the estimated value of their
     shares in GEM Hospitality, LLC;

c)   that they jointly be awarded their costs and if applicable under contractual
     terms, their attorney's fees;

d)   that the City be barred from enforcing the terms of the July 1, 2014 "Side
     Letter" which was obtained only by virture of their breach of contract; and

e)   for such other and further relief as the Court deems equitable and just.

## COUNT II – BREACH OF CONTRACT AGAINST THE CITY OF PEORIA AND JAMES ARDIS, INDIVIDUALLY AND AS MAYOR OF THE CITY OF PEORIA DUTY OF GOOD FAITH AND FAIR DEALING

1-123.   Plaintiffs reallege and reassert paragraph 1-123 as and for paragraphs 1-123 of Count II as though fully set forth herein.

124.   As stated in the Redevelopment Agreement, the contract terms between the parties required each to use their good faith efforts to bring the Pere Marquette Hotel Project to fruition for the benefit of the City of Peoria and its citizens.

125.   Inherent in that contract was an obligation of good faith and fair dealing in the enforcement of the Redevelopment Agreements, as well as the Intercreditor Agreements and other contracts signed between the parties which were assisting in effectuating the Project.

126.   However, the City of Peoria's conduct, as led by Mayor Ardis as the chief negotiator for the City, violated the tenets of good faith and fair dealing repeatedly.

127.   With respect to the initial attempt by the City to cancel the Redevelopment Agreement in August of 2011, the City and Mayor Ardis openly discussed the fact that they cancelled in order to insert themselves as partial owners of the Hotel and to achieve a better rate on employee pension reserves through investment in the real estate. These were purposes wholly separate from the stated purpose of the Redevelopment Agreement, which was not to enrich the City of Peoria or the political power of its Mayor, but rather tho revitalize the Pere Marquette Hotel and that block of Main Street in Peoria.

128.   The City violated the tenets of good faith and fair dealing by using constant threats to terminate the Redevelopment Agreement to achieve concessions in the Amended and Restated Redevelopment Agreement, the Second Amendment to the Redevelopment Agreement, and in its taking a "take it or leave it" attitude to institution of the "Side Letter", when Matthews

attempted to remove the disastrous asset and property management committed by Marriott which was damaging performance of the Hotel and its reputation.

129.    Furthermore, when negotiating the Deutsche Bank proposal, the City's sole refusal to negotiate their mortgage was particularly in bad faith, when every other party to the transaction had either negotiated a reduction or a restructuring of their interest in order accommodate Deutsche Bank's offer. It is submitted that based on commits by Mayor Ardis, John Elias as counsel for City, and Patrick Urich, that the City's refusal to negotiate on the Deutsche Bank matter (and refusal to seek a vote by the City Council) was related to their desire to maintain an ownership interest in the Pere Marquette Hotel, a desire to maintain their return of approximately 7.25% on the employee's pension funds they had invested in the mortgage, and a desire to maintain control over the Project, which it had insinuated by the various changes it had instituted in the amends to the Redevelopment Agreements and the "Side Letter".

130.    Had the Deutsche Bank offer been agreed to by all parties, the City would have lost that control, lost that higher interest rate, and lost its ownership interest in the Hotel, even though the Deutsche Bank deal would have avoided the Hotel's bankruptcy, preserved the Plaintiffs and the investor's interest in the Hotel, and paid the City's principal mortgage balance in full.

131.    On the second attempt to revitalize the Deutsche Bank offer, Mayor Ardis' statement that he would submit a request for reduction of the City's loan to the City Council, while making it clear he would vote against it and not sponsor it or ask anyone to vote for it, was a further act of bad faith. This was particularly true when the prime lenders and other parties to the transaction were taking additional cuts from what they had agreed to in October, and the City was once again the sole non-negotiating party to consummate a Deutsche Bank proposal.

132.    Mayor Ardis, with his negotiating team of Elias and Pudik, further acted in bad faith by refusing, on information and belief, to advise the City Council of the Deutsche Bank proposals and the risk to the City's recovery of its mortgage if the Deutsche Bank proposal failed.

133.    The City further acted in bad faith in its handling of the YAM refinancing proposal in that:

        a)  the City Council was not properly advised as to the meaning of preferred equity in the context of the proposal;

        b)  the City Council was not advised that the YAM lenders were watching the City Council with interest and that comments should be restricted to closed session; and

        c)  the City Council members openly vented their distrust of the Plaintiffs, as well as their dislike of the Project, with such vehemence that the YAM principals watching the City Council recoiled from going through with the offer that was completely agreed to by all parties;

        d)  the City Council's open comments regarding their hatred and distrust of the Project and the Developers, and indeed local corporations, caused YAM to cancel the deal, *despite* the fact that the City Council came back after closed session and voted in favor of the YAM proposal.

134.    Furthermore, subsequent to the Deutsche Bank refinancing failure, the City began to publicly and privately argue that Matthews and Brannan had breached the terms of the "Side Letter" by disbursing funds which were consistent with the fees that would be paid to asset managers. The City and Mayor publicly and privately stated in legal pleadings and implied press

34

conferences that the taking of those funds constituted "fraud", breach of fiduciary duty,

malpractice, and malfeasance. The City argued, in bad faith, that Brannan was bound by the

Agreement even though he did not sign the "Side Letter", nor was he requested to sign the "Side

Letter". The City did not explain to the public or anyone else that to the extent there was a

dispute about the meaning of the "Side Letter", or whether the "Side Letter" was reasonable or

not, was essentially a matter of contractual interpretation, and not fraud. The City did not advise

the public when it was making these statements in press conferences, or in pleadings which were

then reported to the public, that other Lenders, such as the INDURE group, FHG and other

parties to the Contract, were well aware of the reasonable fees being paid to Matthews and

Brannan which were required for asset management in any hotel of this size, and that none of

those parties were objecting or arguing that it was improper.

135.   Based on the City and Mayor Ardis's failure to act in good faith and engage in

fair dealing, as set forth in this Complaint:

a)   the Hotel was forced into bankruptcy, Matthews was forced into bankruptcy, and Brannan was forced into bankruptcy;

b)   Plaintiffs lost their developer's fee interest in the Hotel valued at approximately $9.3 million; and

c)   each of them lost their 5% share of the GEM Hospitality, LLC valued at $1.4 million.

WHEREFORE, based on the foregoing, Plaintiffs pray:

a)   that they jointly be awarded the sum of $9.3 million for the value of the lost development fees in the Hotel;

b)  that they jointly be awarded $1.4 million each for the estimated value of their

shares in GEM Hospitality, LLC;

c)  that they jointly be awarded their costs and if applicable under contractual

terms, their attorney's fees;

d)  that the City be barred from enforcing the terms of the July 1, 2014 "Side

Letter" which was obtained only by virture of their breach of contract; and

e)  for such other and further relief as the Court deems equitable and just.

## COUNT III – TORTIOUS INTERFERENCE WITH CONTRACT AGAINST THE CITY OF PEORIA AND JAMES ARDIS, INDIVIDUALLY AND AS MAYOR OF THE CITY OF PEORIA

1-135.  Plaintiffs reallege and reassert paragraphs 1-135 as and for paragraph 1-135 of

Count III as though fully set forth herein.

136.    Based on the evidence adduced above, there was clearly a valid and enforceable

contract between the Plaintiffs and the City of Peoria, and the Plaintiffs, the City of Peoria and

other lenders in the form of the Intercreditor Agreements and other documents executed between

the parties as part of the Hotel Project and Management Agreement.

137.    The City and Mayor Ardis clearly knew of and understood the Redevelopment

Agreements and the Intercreditor Agreements and Management Agreement.

138.    Despite this knowledge, the City and Mayor Ardis intentionally and unjustifiably

caused a breach of the contract by their repeated attempts to terminate the Redevelopment

Agreement for improper purposes such as creating an ownership interest in the Hotel, forcing

Plaintiffs to give them documents and further control of the Hotel, and to obtain a "Side Letter"

and other concessions solely to increase the City's control and power over the Project and for

political gain.

139.    The City and Mayor Ardis further intentionally and unjustifiably refused to negotiate in the first attempt to execute an agreement with Deutsche Bank and the second attempt to negotiate an agreement with Deutsche Bank, despite the fact that the Deutsche Bank proposal would have paid the City's loan, as well as the prime lending group led by INDURE, Main Street Land Trust, Core Construction, and other parties.

140.    The City refused to negotiate because it did not want to allow Plaintiffs to retain their ownership in the Hotel, or the investor group to retain ownership of the Hotel.

141.    The City refused to negotiate because it did not want to lose its control over the Hotel or its ownership over the Hotel.

142.    Furthermore, the City was clearly aware of the YAM proposal, which only required approval of the City to become effective and binding on all parties. The City intentionally and unjustifiably spoke out against the YAM proposal with defamatory comments that the developers were not trustworthy, and personal comments that several of the councilmembers would rather see the entire deal fail than allow the developers to maintain control of the Project. The City Council intentionally and unjustifiably stated their dislike of the Project, and their distaste at approving the YAM proposal with such vehemence that they caused YAM to cancel the proposal, *despite* the fact that the City ultimately voted after a closed session to approval the YAM proposal.

143.    The result of this conduct by the City was that:

a) Plaintiffs were deprived of the benefits of the Deutsche Bank proposal, as outlined in this Complaint;

b) Plaintiffs were denied the benefits of the YAM proposal; and

c) as a result of the loss of those contracts, the Hotel was forced into bankruptcy, causing the Plaintiffs to loss the developer's fee and all interest in GEM Hospitality, LLC.

WHEREFORE, based on the foregoing, Plaintiffs pray:

a)   that they jointly be awarded the sum of $9.3 million for the value of the lost development fees in the Hotel;

b)   that they jointly be awarded $1.4 million each for the estimated value of their shares in GEM Hospitality, LLC;

c)   that they jointly be awarded their costs and if applicable under contractual terms, their attorney's fees; and

d)   for such other and further relief as the Court deems equitable and just.

## COUNT IV – TORTIOUS INTERFERENCE WITH A VALID BUSINESS RELATIONSHIP AND EXPECTANCY

1-143.   Plaintiffs reallege and reassert paragraphs 1-143 as and for paragraph 1-143 of Count IV as though fully set forth herein.

144.   Based on the foregoing facts, Plaintiffs had a reasonable expectancy of entering into a lending relationship with Deutsche Bank.

145.   The City and Mayor Ardis knew that the Deutsche Bank proposal would pay virtually all parties with liens or other interests in the Hotel, and while not paying anything to the investors or to the Plaintiffs, would allow those parties to be in control of the Hotel with Deutsche Bank as the sole additional lender.

146.   The City, by being the sole non-negotiating party with regard to the Deutsche Bank proposal or efforts to consummate a second deal with Deutsche Bank, caused the Deutsche Bank refinancing to fail.

38

147.    The City unjustifiably refused to negotiate and interfered with closing on the
Deutsche Bank deal because it did not want to lose 7.25% interest on its employee's pension
investment, did not want to lose its mortgage ownership interest in the Hotel, and did not want
lose the control over the Hotel operations that it had gained through its numerous bad faith
negotiations with respect to the Redevelopment Agreement and the "Side Letter".

148.    The City believed (as evidenced by some of the councilmembers' statements, as
well as Mayor Ardis in negotiating these statements) that by destroying the Deutsche Bank deal,
the City could somehow retain control of the Hotel while destroying the ownership interest of
Plaintiffs herein.

149.    As a result of the conduct of the Defendants, the reasonable expectancy of
Plaintiffs in a lending relationship with Deutsche Bank failed, and as a result, any reasonable
opportunity to save the Hotel from foreclosure, and ultimately bankruptcy, was lost.

150.    Furthermore, the City was clearly aware of the YAM proposal, which only
required approval of the City to become effective and binding on all parties. The City
intentionally and unjustifiably spoke out against the YAM proposal with defamatory comments
that the developers were not trustworthy, and personal comments that several of the
councilmembers would rather see the entire deal fail than allow the developers to maintain
control of the Project. The City Council intentionally and unjustifiably stated their dislike of the
Project, and their distaste at approving the YAM proposal with such vehemence that they caused
YAM to cancel the proposal, *despite* the fact that the City ultimately voted after a closed session
to approval the YAM proposal.

151.    The result of all Defendants conduct was that all attempts at refinancing failed
and the Hotel and the Plaintiffs went into bankruptcy, Plaintiffs lost their developer's fee interest

in the Hotel valued at approximately $9.3 million, and Plaintiffs lost their 5% share of the GEM

Hospitality, LLC valued at $1.4 million each.

WHEREFORE, based on the foregoing, Plaintiffs pray:

a)  that they jointly be awarded the sum of $9.3 million for the value of the lost

development fees in the Hotel;

b)  that they jointly be awarded $1.4 million each for the estimated value of their

shares in GEM Hospitality, LLC;

c)  that they jointly be awarded their costs and if applicable under contractual

terms, their attorney's fees; and

d)  for such other and further relief as the Court deems equitable and just.

**Plaintiffs demand trial by jury on all counts.**

GARY E. MATTHEWS and MONTE J.
BRANNAN, Plaintiffs

By:_____
Their Attorney

**CHRISTOPHER P. RYAN**
**ATTORNEY AT LAW**
**245 N.E. Perry Avenue**
**Peoria, Illinois 61603**
**Ph.    (309) 637-8020**
**Fax:   (309) 637-5433**
**Email:** cpryan@cpryanlaw.com
**ARDC #6188385**

IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT OF ILLINOIS
PEORIA COUNTY

| | | |
|---|---|---|
| GARY E.  MATTHEWS and MONTE J. BRANNAN, | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 19 L 49 |
| THE CITY OF PEORIA, et al., JAMES ARDIS, individually and as Mayor of the City of Peoria, | ) ) ) ) | |
| Defendants, | ) | |

## CERTIFICATE OF SERVICE

To:

> Janaki Nair (jnair@emrslaw.com)
> Elias, Meginnes & Seghetti, P.C.
> 416 Main Street, Suite 1400
> Peoria, IL 61602
>
> Jeana K. Reinbold, Trustee
> (jeana@jeanareinboldlaw.com)
> 1100 S. 5th Street
> Springfield, Illinois

The undersigned certifies that she caused to be served a true and correct copy of the

foregoing document upon the above parties via email/e-file on August 22, 2019.


_____
Jesse J. Baggott, Paralegal


ATTORNEY FOR PLAINTIFFS:
CHRISTOPHER P. RYAN, P.C.
245 NE Perry Ave.
Peoria, Illinois 61603
Phone: 309-637-8020
Fax: 309-637-5433
Email: cpryan@cpryanlaw.com
ARDC #6188385

1